IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| THOMAS M.[1], | ) |
| | ) Civil Action No. 7:22-cv-00518 |
| Plaintiff, | ) |
| v. | ) REPORT & RECOMMENDATION |
| | ) |
| MARTIN O'MALLEY,[2] | ) By: C. Kailani Memmer |
| Commissioner of Social Security, | ) United States Magistrate Judge |
| | ) |
| Defendant. | ) |

Plaintiff Thomas M. ("Thomas") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding him not disabled and therefore ineligible for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433; 42 U.S.C. §§ 1381–1383f. Thomas alleges that the Administrative Law Judge Thomas Erwin ("ALJ") erred in his assessment of (1) Thomas's mental impairments; (2) Thomas's subjective allegations; and (3) Thomas's physical impairments.

This case is before me on referral under 28 U.S.C. § 636(b)(1)(B), dated October 12, 2023. Thomas requested oral argument be scheduled in this case. *See* ECF No. 16 at 32. However, having considered the administrative record, the parties' filings, and the applicable law, I find that oral argument would not aid the decisional process, and that the Commissioner's decision is supported by substantial evidence. Accordingly, and for the reasons detailed below, I

---

[1] Due to privacy concerns and because social security opinions often contain intensely personal medical information about claimants, I use only the first name and last initial of the claimant in such opinions.
[2] Martin O'Malley became the Commissioner of Social Security on December 20, 2023. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin O'Malley should be substituted for Kilolo Kijakazi as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

respectfully recommend **GRANTING** the Commissioner's Motion for Summary Judgment, ECF No. 17; **DENYING** Thomas's Motion for Summary Judgment, ECF No. 15; **AFFIRMING** the Commissioner's final decision denying Thomas's DIB and SSI claims; and **DISMISSING** this case from the Court's active docket.

## STANDARD OF REVIEW

The court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Thomas failed to demonstrate that he was disabled under the Act.[3] *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (emphasizing that the standard for substantial evidence "is not high"). While substantial evidence is a somewhat deferential standard, the Court does not "reflexively rubber-stamp an ALJ's findings." *Lewis v. Berryhill*, 858 F.3d 858, 870 (4th Cir. 2017).

"In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro*, 270 F.3d at 176 (quoting *Craig v. Chater*, 76 F.3d at 589). Nevertheless, the court "must not abdicate [its] traditional functions," and it "cannot escape [its]

---

[3] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period for not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work; instead, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. *See* 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

2

duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. *Hays v. Sullivan*, 907 F. 2d 1453, 1456 (4th Cir. 1990).

In contrast, remand is appropriate if the ALJ's analysis is so deficient that it "frustrate[s] meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (noting that "remand is necessary" where the court is "left to guess [at] how the ALJ arrived at his conclusions"). The ALJ must sufficiently articulate his findings such that the district court can undertake meaningful review. *See Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016).

## **CLAIM HISTORY**

Thomas filed for DIB and SSI on June 19, 2019, claiming his disability began on October 1, 2017. R. 15. His claims were denied at both the initial level and on reconsideration on August 23, 2019, and February 21, 2020, respectively. *Id.* Thomas appeared before the ALJ by telephone on October 6, 2021. R. 42–71. At the hearing, Thomas amended his alleged onset date to July 13, 2018. R. 47–48. The ALJ issued an "Unfavorable Decision" analyzing Thomas's claim under the familiar five-step process[4] on October 22, 2021, and denied Thomas's claim for benefits. R. 12–36.

---

[4] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether she can perform other work. *Johnson v. Barnhart*, 434 F.3d 650, 654 n.1 (4th Cir. 2015) (per curiam) (citing 20 C.F.R. § 404.1520); *Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a *prima facie* case for disability. At the fifth step, the burden shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); *Taylor v. Weinberger*, 512 F.2d 664, 666 (4th Cir. 1975).

3

The ALJ found that Thomas met the insured status requirements of the Social Security Act through September 30, 2019. R. 18. At the first step, the ALJ found that Thomas had not engaged in substantial gainful activity during the period since July 13, 2018, the amended alleged onset date. R. 18. At the second step, the ALJ found that Thomas has the following severe impairments: degenerative disc disease; chronic obstructive pulmonary disease ("COPD"); kidney disease; residuals of clavicle fracture; mild degenerative joint disease; substance use disorder; personality disorder; depression; and anxiety. *Id.*

As to the third step, the ALJ found that Thomas's impairments, either individually or in combination, did not meet or equal a listed impairment. R. 19. The ALJ specifically considered Listing 1.15 (compromise of a nerve root), 1.18 (abnormality of a major joint), 1.23 (non-healing or complex fracture of the femur, tibia, pelvis, or one or more of the talocrural bones), 3.02 (chronic respiratory disorders), 4.04 (ischemic heart disease), 12.04 (depressive, bipolar, and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), 12.11 (neurodevelopmental disorders), and 12.15 (trauma and stressor-related disorders). R. 19–20. The ALJ found that Thomas has moderate limitations regarding understanding, remembering, or applying information. R. 20. He has moderate limitations in interacting with others. R. 21. He has moderate limitations regarding concentrating, persisting, or maintaining pace. R. 22. He has moderate limitations for adapting or managing oneself. R. 23.

At the fourth step, the ALJ concluded that Thomas is unable to perform any past relevant work. R. 34. The ALJ concluded that Thomas has the RFC to perform light work as defined in 20 C.F.R. 404.1567(b) except he can have occasional exposure to unprotected heights, like ladders, ropes, or scaffolds, and pulmonary irritants, such as fumes, odors, dust, gases, or poorly ventilated areas. Instructions and tasks are limited to those that can be learned in thirty days or

4

less. There can be no fast-paced production rate or pace work, defined as having to keep up with an assembly line that is constantly moving, or in a job with strict daily or hourly quotas. There can be no more than occasional interaction with the public, coworkers, or supervisors. R. 24.

At the fifth step, the ALJ identified jobs in significant numbers in the national economy that Thomas could perform, including positions as a laundry worker, price marker, addressing clerk, or document preparer. R. 35. Thus, the ALJ determined that Thomas was not disabled. *Id.* The ALJ's decision became the Commissioner's final decision when the Appeals Council denied Thomas's request for review on July 22, 2022. R. 1–6.

## ANALYSIS

Thomas argues that there is not substantial evidence to support the ALJ's assessment of (1) Thomas's mental impairments; (2) Thomas's subjective allegations; and (3) Thomas's physical impairments.

### A. Medical History Overview

Thomas was born on September 9, 1976, in New York. R. 34. He has at least a high school education. *Id.*

Thomas presented to Marvin A. Gardner, Jr., Ph.D. for a psychological examination on March 18, 2016. R. 432–38. He was driven to the examination by his mother. R. 432. His head was shaved, and his hygiene was "fair." *Id.* During the examination, Thomas sat forward in his chair, played with his hands, and frequently looked down at the floor when not answering questions. *Id.* He complained of mistreatment by fellow employees and supervisors at his job before he was fired. R. 433. Thomas indicated that he had two friends, lived by himself, and neither went to church nor belonged to any groups. *Id.* Thomas indicated that he had been prescribed Paxil, an antidepressant, for two years, but that he often forgets to take it. *Id.* He

5

complained of pain in his lower back, which ranged from 3–4 on a good day to 8–9 on a bad day. *Id.*

During the examination with Dr. Gardner on March 18, 2016, Thomas indicated that he served in the army for six months before being honorably discharged. R. 434. He'd had approximately ten employers, and had worked as a dishwasher, pizza delivery person, forklift operator, door-to-door salesman, carpenter, and telemarketer. *Id.* Most jobs would last an average of nine months, and he was often fired for attendance issues. *Id.* Additionally, Thomas reported that he began using controlled substances around the age of 16, including marijuana, mushrooms, LSD, and cocaine, which he was still using at that time. *Id.* He described his mood as "anxious," and his energy levels as "up and down." *Id.* Dr. Gardner noted that it was likely Thomas's continued use of cocaine that is the primary issue regarding mental health, rather than a bipolar disorder. *Id.* Dr. Gardner diagnosed Thomas with the following: alcohol use disorder in sustained remission; polysubstance use disorder in early remission; opioid use disorder, moderate; unspecified depressive disorder, moderate; unspecified anxiety disorder with panic attacks, moderate; other specified personality disorder with borderline antisocial traits; and nonadherence to psychiatric treatment. R. 436–37.

In the March 18 report, Dr. Gardner indicates that:

> Thomas is able to perform simple and repetitive work tasks and maintain regular attendance in the workplace. He is able to perform work activities without special or additional supervision. This mental source statement does not reference any physical impairments that he may have. He is of normal intelligence and is able to perform work activities without special or additional supervision. He is able to complete a normal workday or work week without interruptions resulting from his psychiatric condition when remaining abstinent from substances. He was able to accept all instructions given by this examiner and to respond appropriate. He is able to accept instructions from supervisors. He is able to interact with supervisors and coworkers with no more than a moderate impairment of social interaction due to his personality traits when remaining abstinent from substances.

> He is able to deal with the usual stresses encountered in competitive work when remaining abstinent from substances and adherent to his psychiatric treatment.

R. 437.

Thomas was incarcerated beginning at an indeterminate time and ending on December 23, 2018, for stealing a car. R. 458. He presented to Blue Ridge Behavioral Healthcare ("Blue Ridge") on December 31, 2018, for intake. R. 486–580. The "Client Narratives" indicate that Thomas was to participate in a face-to-face comprehensive clinical assessment to evaluate his strengths, as well as areas of need and preferences. R. 486.

Thomas was admitted to Lewis Gale Medical Center ('Lewis Gale") on January 5, 2019, for suicidal ideation. R. 440–478. During his time at Lewis Gale, Thomas reportedly "got along well on the unit, attending psychotherapy groups and meals appropriately." R. 444. He did not display any unsafe behaviors while in the hospital, and he reported a gradual improvement in his mood. *Id.* He was discharged on January 11, 2019, after he was no longer an acute danger to himself. R. 443–44.

After being discharged from Lewis Gale, Thomas attended orientation at Blue Ridge on January 30, 2019, and reported no substance use in five months. A psychiatric evaluation note from January 31, 2019, indicates that while he had been prescribed 40 mg Paxil daily, he had been taking only 20 mg daily. R. 492. He reported a depressed mood, anxiety, "come and go" interest and motivation, and infrequent paranoia. *Id.*

On February 7, 2019, Thomas missed his group meeting at Blue Ridge, and staff was unable to contact Thomas. R. 497–98. The next day, an Engagement Specialist contacted Thomas about his missed group meeting on February 7, and Thomas explained that he thought his group began on February 14. R. 500. On February 14, Thomas attended his group meeting and rated his stress on the Subject Units of Distress Scale ("SUDS") at 9 out of 10 because of a

7

recent arrest. R 501. At that time, Thomas was homeless and was living at the Rescue Mission, and he reported that his family gave away his possessions while he was in jail. *Id.*

Thomas attended his group meeting at Blue Ridge on February 21, 2019. R. 503. He rated his SUDS score at 6 out of 10, and he indicated that he was struggling with being active and productive based on his disability. *Id.* Thomas was absent from his group meeting on February 28, 2019. R. 506. He was a no-show at the March 7, 2019, group meeting. R. 508. He had his third absence from group on March 14, 2019, and was removed from the group in accordance with Blue Ridge policy. R. 510–11. On March 21, 2019, he spoke with Karen Burroughs of Blue Ridge and indicated that his life was more stable now, and he asked to be reinstated in group. R. 511. He attended group that same day, and he reported his SUDS score as being 2 out of 10. R. 513.

Thomas attended his group meeting at Blue Ridge on March 28, 2019. R. 515. He reported his SUDS score was at a 2 out of 10. *Id.* He indicated that he had been having difficulty sleeping, which was an issue he had been having for over twenty years. *Id.* He was a no-show at his group meeting scheduled for April 4, 2019. On April 10, 2019, he met with a Blue Ridge Engagement Specialist, who advised him about Blue Ridge's No-Show policy. R. 521. He attended his group meeting on April 11, 2019, and stated that he thought things were going well. R. 523. He indicated that "he was approved for disability" and that he enjoyed being a DJ. *Id.* He was a no-show to a group meeting on April 18, 2019, and was subsequently discharged from the program at Blue Ridge for failure to adhere to their participation and cancellation policy. R. 526.

Thomas returned to Blue Ridge on July 1, 2019, and indicated he would prefer individual counseling over group sessions. R. 564. He complained of chronic hypersomnia, depression, varying appetite, problems with concentration and focus, lack of motivation, and anxiety with

8

panic attacks. *Id.* His mood at the time was noted as "anxious," and he was oriented to time, place, person, and situation. R. 565. He was noted to be anxious as evidenced by frequent nail biting and fidgeting. R. 566. Thomas reported that he had worked at a bleach plant, Kick, for about three months in 2018, but that he felt being self-employed had worked best for him. R. 576.

On Monday, July 22, 2019, Thomas presented to MedExpress with a chief complaint of an injury to his right knee. R. 582. Thomas indicated that he was painting that previous Friday and had done a lot of walking that previous Saturday. *Id.* Thomas reported that he had fractured his right knee when he was between eight and nine years old. *Id.* Examination revealed a normal range of motion for both knees, full strength against resistance, and no swelling of the knee. R. 583. However, the examination noted a right-sided limp and tenderness to palpation in the right lateral knee. *Id.* Thomas was advised to take Tylenol as directed and to follow up with his primary care provider. *Id.*

Thomas was referred to William Humphries, M.D., C.I.M.E., by Disability Determination Services ("DDS") for an examination conducted on August 15, 2019. R. 594–97. Thomas reported his chief medical condition was his lower back, and he reported that he had experienced significant low back pain since the 1990s. R. 594. Thomas indicated his low back pain was continuous and worsened with bending, lifting, prolonged standing or walking, and prolonged sitting. *Id.* Thomas also reported intermittent pain in his right knee that worsened with standing, walking, or weather changes, as well as pain in his wrists. *Id.* Thomas moved on and off the examination table without difficulty. R. 595. On examination, his back was tender to palpation in the lower thoracic and entire lumbar region, with mild dorsal kyphosis. R. 596. His right knee was slightly tender to palpation. *Id.* His mental status and high cortical function was

9

normal. *Id.* Dr. Humphries diagnosed Thomas with chronic lumbar strain; posttraumatic degenerative joint disease ("DJD"), right knee and wrists; COPD, mild; renal insufficiency, by history; and DJD mild hands. *Id.* Based on the findings of the evaluation, Dr. Humphries indicated that Thomas could be expected to: sit for six hours in an eight-hour workday; stand for six hours in an eight-hour workday; walk for six hours in an eight-hour workday; lift 50 pounds occasionally and 20 pounds frequently; have no restriction regarding climbing, stooping, kneeling, and crouching; be limited to occasional crawling; be restricted regarding heights or hazards; avoid fumes. R. 596–97.

In a "Disability Determination Explanation" dated August 22, 2019, Robert McGuffin, M.D., a medical consultant with DDS, reviewed the medical record and issued an RFC assessment. R. 105–06. In that assessment, Dr. McGuffin opined that Thomas could occasionally lift and carry fifty pounds; frequently lift and carry twenty-five pounds; stand or walk for a total of six hours in an eight-hour workday; sit for a total of six hours in an eight-hour workday; have no limits in pushing or pulling; and avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc. *Id.*

In that same August 22, 2019, form, Stephen P. Saxby, Ph.D., a psychological consultant with DDS, considered Thomas's impairments including his anxiety and obsessive-compulsive disorder; depressive, bipolar, and related disorders; and personality and impulse-control disorders. R. 103. Dr. Saxby found those impairments to be severe, and that they caused Thomas moderate limitations in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. *Id.* Dr. Saxby found that Thomas's substance abuse disorders regarding both drugs and alcohol were non-severe. *Id.* Dr. Saxby opined that despite Thomas's depression, anxiety, and personality

10

disorder, he should be able to understand short, simple instructions; follow one- or two-step directions; work in an environment with limited contact with others; work in a static environment; and be capable of simple, unskilled work. R. 107–09.

On October 29, 2019, Thomas presented to Lindsay Bolger, BSW, SOAR, for a psychological evaluation. R. 606–612. Ms. Bolger noted that Thomas talked at a fast pace, had disorganized thoughts, and could not keep eye contact with her. R. 606. Thomas reported that his memory had changed in the last three to five years, and that he had a difficult time with his short-term memory. R. 609. He has contact with his mother daily but is overwhelmed by large crowds. R. 610. He has few friends and indicates a lack of trust in others. *Id.* Ms. Bolger noted that Thomas had to be frequently reminded and refocused on the topic at hand, and it would take between an hour and an hour-and-a-half to finish discussion of any given topic. *Id.* She noted that Thomas is easily distracted and has a difficult time concentrating. R. 611. Thomas indicated that he relies upon his mother for a variety of functions, such as shopping, obtaining food, laundry, cleaning, and life changes. R. 611.

On November 11, 2019, Thomas presented to the care of Priscilla Tu, D.O., at Salem Family Medicine with chief complaints of anxiety and depression. R. 613. Thomas reported depression, anxiety, chronic low back pain, chronic kidney disease, and dry skin. *Id.* He reported that he felt stressed with someone living with him at the time and that he did not have his gabapentin; otherwise, he stated that he felt he was doing better. *Id.* Dr. Tu provided no particular medical findings for this visit. *See* R. 613–616. She did, however, assess Thomas with depression with anxiety, chronic midline low back pain with right-sided sciatica, chronic kidney disease stage 3, other microscopic hematuria, dry skin, and need for vaccination. R. 616.

In a "Disability Determination Explanation" dated February 21, 2020, Leslie E. Montgomery, Ph.D., A.B.P.P., a psychological consultant with DDS, considered Thomas's depressive, bipolar and related disorders; anxiety and obsessive-compulsive disorders; and personality and impulse-control disorders. R. 157. Dr. Montgomery found those impairments to be severe. *Id.* Dr. Montgomery found Thomas's substance addiction disorders with both drugs and alcohol to be non-severe. *Id.* Dr. Montgomery determined that Thomas's severe impairments caused moderate limitations with regard to understanding, remembering, and applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. *Id.* Regarding Thomas's RFC, Dr. Montgomery opined that Thomas would be able to understand one- or two-step instructions; maintain attention and concentration for two-hours periods to complete an eight-hour workday; complete a full workweek with minimal interruption from his symptoms; interact occasionally with co-workers, the public, and with supervisors; and need occasional assistance adapting to change. R. 161–62.

On June 25, 2020, Thomas presented to Blue Ridge for a psychosocial annual reassessment.[5] R 645–52. Elizabeth Pfeiffer, a qualified mental health professional, conducted the reassessment. R. 652. Ms. Pfeiffer reviewed Thomas's medical history, and Thomas reported he had no updates on his condition. R. 645. He did report that he had Stage I kidney disease but was not seeing any medical providers to follow up on that issue. R. 646. He reported his mother was his only positive social support. R. 648.

In a quarterly review from Blue Ridge dated September 22, 2020, staff noted that Thomas had not attended appointments with Blue Ridge psychological services because he was closed to

---

[5] Thomas was discharged from Blue Ridge on January 22, 2020, for mental health treatment, as he had not scheduled services since August 2019. R. 633.

12

those services in January 2020, but that he continued to get his medications through his primary care provider. R. 667. Thomas was referred to case management on June 29, 2020, but he was not able to meet with case management until July 30, 2020, because Blue Ridge staff could not reach Thomas despite multiple attempts to do so. *Id.*

On September 29, 2020, Thomas presented to the care of Denise Dillingham, PA-C, for a follow-up appointment related to his chronic pain, depression, and anxiety, as well as to review an MRI. R. 881. Thomas stated that he felt like his increased weight and decreased activity was part of his increased pain, as he could not recall an injury. *Id.* He noted pain that radiated down his back left leg such that he could not stand, and that problem had developed within recent weeks. *Id.* Thomas had a panic attack when he had an MRI. *Id.* Ms. Dillingham assessed Thomas with herniated invertebral disc of lumbar spine; other chronic pain; lumbago with sciatica, right side; lumbago with sciatica, left side; other idiopathic scoliosis, thoracolumbar region; and elevated triglycerides with high cholesterol. R. 883.

Thomas returned to Ms. Dillingham's care on January 13, 2021, to have "issues" triaged. R. 894. Thomas complained of anxiety, twitching, shaking, and daily panic attacks. *Id.* Thomas indicated that he has an unhealthy diet and eats late at night, primarily snacks and junk food. *Id.*

Thomas returned to Ms. Dillingham's care on March 18, 2021, for a follow up appointment. He reported bad anxiety but denied suicidal ideation. R. 889. He reported that he felt under a lot of stress, primarily related to his disability application. *Id.* He apologized for missing his last few appointments for various reasons. *Id.* On examination, Thomas was in no apparent distress but did appear anxious and fidgety. R. 890.

Thomas returned to Ms. Dillingham's care on June 9, 2021, with complaints of bilateral low back pain. R. 885. Thomas denied weakness in his legs but did state that he had some

13

intermittent numbness in his upper thighs. *Id.* On physical examination, he demonstrated full range of motion, his lumbar spine had no tenderness to palpation, his lower extremities were neurologically intact, and his straight leg raise was negative bilaterally. R. 886. Psychologically, Thomas's affect was normal. *Id.*

On September 30, 2021, Thomas underwent a lumbar evaluation at CORA Physical Therapy. R. 904–06. He reported symptoms including an achy pain in the low back with intermittent numbness and tingling down both legs. R. 905. Limitations in his strength and range of motion were noted on assessment, and those limitations affected Thomas's ability to sit, stand, and ambulate. *Id.* Thomas was identified as being a candidate who would benefit from physical therapy services, and his plan of care involved being seen twice weekly for six weeks. *Id.*

### B. The Commissioner's Decision is Supported by Substantial Evidence

Thomas argues that there is not substantial evidence to support the ALJ's assessment of (1) Thomas's mental impairments; (2) Thomas's subjective allegations; and (3) Thomas's physical impairments.

First, Thomas argues that there is not substantial evidence to support the ALJ's assessment of Thomas's mental impairments. Thomas argues that the ALJ failed to engage in a sufficiently robust discussion of Thomas's mental impairments, and that he failed to explain how the RFC accommodated Thomas's moderate limitations in concentrating, persisting, or maintaining pace, or his moderate limitations in interacting with others. *See* ECF No. 16 at 15–24.

There is substantial evidence to support the ALJ's assessment of Thomas's mental impairments, and the ALJ engaged in a sufficiently robust discussion of Thomas's mental impairments. At Step Three, the ALJ determined that Thomas has moderate limitations regarding

14

concentrating, persisting, or maintaining pace. R. 22. In making this determination, the ALJ cited to evidence found throughout the record. *Id.* Regarding Thomas's RFC, the ALJ concluded that "[i]nstructions and tasks are limited to those that can be learned in thirty days or less [and there] can be no fast-paced production rate or pace work, defined as having to keep up with an assembly line that is constantly moving, or in a job with strict daily or hourly quotas." R. 24.

Thomas argues that "a proper assessment of plaintiff's RFC requires a more-in depth discussion of her [sic] mental impairments at Step 4 than at Step 2 or 3," ECF No. 16 at 16. While it is true that the mental RFC assessment used at Steps 4 and 5 "requires a more detailed assessment by itemizing various functions," SSR 96-8p, it does not follow that an in-depth discussion of a claimant's mental impairments at Step 4 must always somehow exceed or transcend the ALJ's discussion of said impairments at Step 2 or 3, as Thomas suggests. In other words, an ALJ could engage in an in-depth discussion of a claimant's mental impairments at Step 2 or 3 that would satisfy the requirements of a Step 4 discussion. *See Keene v. Berryhill*, 732 Fed. App'x 174, 177 (4th Cir. 2018) (finding that the Court "must read the ALJ's decision as a whole," and that an ALJ's conclusions in one step can be upheld based on findings in other steps of the five-step process). The ALJ did so in this case, and he states in Step 4 that, "[Thomas's] mental residual functional capacity limitations are described **in more detail** in finding four above." R. 30 (emphasis added).

Here, the ALJ noted that Thomas did not complain of any serious difficulty maintaining concentration, persistence, or pace, but that Thomas reported symptom improvement with psychiatric mediation. R. 22. The ALJ discussed and cited to evidence in the record that treating and examining practitioners "did not regularly observe that [Thomas] was overly distractible or slow, and his attention and concentration were often intact" when seeing providers at Blue

15

Ridge. *Id.* While Thomas did present as "fidgety and distracted," the ALJ noted that Thomas reported "doing a variety of daily tasks that require some concentration, persistence, and pace," such as "hanging out with his parents, going for short walks, making doctor's appointments, and seeing his friends." *Id.* In addition, the ALJ noted that Thomas "was able to prepare simple meals, do laundry, and sometimes mopped the floor." *Id.*

As for Thomas's limitations on interacting with others, the ALJ discussed the opinions of Stephen Saxby, Ph.D., Leslie Montgomery, Ph.D., and Marvin Gardner, Jr., Ph.D. R. 31–32. The ALJ considered Dr. Saxby's opinion that Thomas could interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers without distracting them or exhibiting behavioral extremes, and maintain socially appropriate behavior. R. 32. Additionally, he considered Dr. Montgomery's opinion that Thomas "could interact occasionally with coworkers, the public, and supervisors." *Id.* Additionally, in Step 3, the ALJ cited evidence throughout the record showing that Thomas "generally interacted normally with all practitioners," and that he was "pleasant, cooperative, and in no distress." R. 21. Thus, the ALJ engaged in sufficiently robust discussion of Thomas's mental impairments, and the Commissioner's decision should not be upset on Thomas's first grounds of argument.

Next, Thomas argues that there is not substantial evidence to support the ALJ's assessment of Thomas's subjective allegations. In particular, Thomas argues that the ALJ "did not perform a thorough evaluation of [Thomas's] alleged symptoms, and his decision is not adequately specific to make clear to subsequent reviewers the extent to which the alleged functional limitations and restrictions were found to be consistent with the evidence of record." ECF No. 16 at 30.

An ALJ must assess a claimant's subjective complaints about the extent of his functional limitations considering the objective medical evidence and other factors, including his treatment history, medications, work history, and daily activities. 20 C.F.R. §§ 404.1529(c), 416.929(c). He must engage in a two-step process in which he first determines whether there is an underlying medically determinable mental or physical impairment that could reasonably be expected to produce the claimant's pain or other symptoms, then the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities. 20 C.F.R. §§ 404.1529(b)–(c), 416.929(b)–(c). An ALJ's assessment of the credibility of a claimant's subjective complaints are afforded a high level of deference on review, as the Fourth Circuit has proclaimed such assessments are "virtually unreviewable" on appeal. *Darvishian v. Geren*, 404 F. App'x 822, 831 (4th Cir. 2010).

There is substantial evidence to support the ALJ's assessment of Thomas's subjective allegations. In this case, the ALJ engaged in the familiar two-step process described above. He made an express finding that Thomas's impairments could reasonably be expected to cause the alleged symptoms. R. 29, 31. However, the ALJ concluded that "[Thomas's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." R. 29. In coming to this conclusion, the ALJ analyzes various symptoms and inconsistencies in the record: (1) Thomas treated his back pain, knee pain, clavicle fracture, and wrist pain with gabapentin for years, R. 29; (2) Thomas had intermittent findings of tenderness to palpation of the back and rare findings of limited range of motion, but his gait, strength, and sensation were consistently intact, *id.*; (3) Thomas has a history of COPD, but his pulmonary examination findings were generally normal, R. 30; and (4) Thomas claims a history of kidney disease but had no active treatment during the

17

period of review or associated symptom complaints. *Id.* Overall, the ALJ provides a logical bridge for this Court to understand how he came to his conclusions regarding his assessment of Thomas's subjective allegations, and in reviewing the record as a whole, the ALJ's decision is both rational and supported by substantial evidence.

Lastly, Thomas argues that there is not substantial evidence to support the ALJ's assessment of Thomas's physical impairments. Thomas argues that the ALJ's assessment of Thomas's physical impairments is "cursory" and does not create a logical bridge to explain how the ALJ arrived at his determination regarding Thomas's RFC limitations. *See* ECF No. 16 at 31.

There is substantial evidence to support the ALJ's assessment of Thomas's physical impairments. The ALJ discussed Thomas's physical impairments, including his degenerative disc disease, COPD, and kidney disease, alongside the pertinent medical evidence throughout the record. R. 27–33. Regarding Thomas's degenerative disc disease, the ALJ summarizes the medical evidence in the record and notes "intermittent findings of tenderness to palpation of the back and rare findings of limited range motion," but correctly identifies that Thomas's "gait, strength, and sensation were consistently intact." R. 29. Although the ALJ determined that Thomas's degenerative disc disease warranted limitations restricting Thomas to "light exertion work with occasional exposure to unprotected heights, like ladders, ropes, or scaffolds," the ALJ correctly noted that Thomas's treatment was "conservative," and that "he often had largely normal objective examination findings with the exception of lumbar paraspinous tenderness to palpation, which is not incompatible with light exertion work." R. 29–30. Having reviewed the record as a whole, substantial evidence supports the ALJ's assessment of Thomas's degenerative disc disease.

Next, regarding Thomas's kidney disease, the ALJ noted that Thomas's kidney failure was initially at Stage III but was at only Stage I when rechecked in September 2020. R. 28. The ALJ explained that Thomas would be restricted to light exertional work with occasional exposure to ladders, ropes, or scaffolds, because of Thomas's lack of active treatment for kidney disease, as well as the lack of associated symptom complaints, so Thomas's RFC accommodates potential abdominal discomfort. R. 30. Having reviewed the available medical evidence in the record, substantial evidence supports the ALJ's findings on Thomas's kidney disease, as there is a notable lack of evidence showing active treatment for kidney disease, as well as a lack of evidence showing substantive symptom complaints related to Thomas's kidney disease.

Finally, regarding Thomas's COPD, the ALJ noted that Thomas's pulmonary examination findings were generally normal with treating providers, and that there was no evidence to show any emergency room treatment or inpatient hospitalization for Thomas's breathing issues. R. 29, 30. The evidence in the record shows that even when Thomas experienced shortness of breath due to smoking, the use of an albuterol inhaler helped. R. 894. Nevertheless, the ALJ considered Thomas's history of COPD, and accommodated that history with a restriction to light exertional work with occasional exposure to pulmonary irritants, such as fumes, odors, dust, gases, or poorly ventilated areas. R. 30. In sum, the ALJ did build a logical bridge, supported by substantial evidence, from his discussion of the medical evidence and Thomas's physical impairments to Thomas's RFC.

Overall, there is substantial evidence to support the Commissioner's final decision in this case, and this Court is not "left to guess" at how the ALJ arrived at his conclusions. Therefore, it is appropriate to affirm the Commissioner's decision.

## CONCLUSION

For the foregoing reasons, I respectfully recommend that the presiding District Judge **GRANT** the Commissioner's Motion for Summary Judgment, ECF No. 17; **DENY** Thomas's Motion for Summary Judgment, ECF No. 15; **AFFIRM** the Commissioner's final decision denying Thomas's DIB and SSI claims; and **DISMISS** this case from the Court's active docket.

## NOTICE TO PARTIES

The clerk is directed to transmit the record in this case to Robert S. Ballou, United States District Judge, and to provide certified copies of this Report and Recommendation to counsel of record.

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party must serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings, as well as to the conclusion reached by the undersigned, may be construed by any reviewing court as a waiver of such objection, including the waiver of the right to appeal.

Entered: January 26, 2024

*C. Kailani Memmer*

C. Kailani Memmer
United States Magistrate Judge